279 F.2d 220
 AMERICAN NATURAL GAS COMPANY, Madison Gas and Electric Company, Michigan Consolidated Gas Company, Michigan Wisconsin Pipe Line Company, Milwaukee Gas Light Company, and Milwaukee Solvay Coke Company
v.
UNITED STATES.
 No. 3-56.
 United States Court of Claims.
 June 8, 1960.
 
 Arthur R. Seder, Jr., Chicago, Ill., for plaintiffs. Middleton Miller, J. Dean Vail, Jr., Robert R. Frei, Jules M. Perlberg, and Sidley, Austin, Burgess & Smith, Chicago, Ill., were on the briefs.
 Jerome S. Hertz, Washington, D. C., with whom was Asst. Atty. Gen. Charles K. Rice, for defendant. James P. Garland and Philip R. Miller, Washington, D. C., were on the brief.
 WHITAKER, Judge.
 
 
 1
 Plaintiffs sue to recover an alleged overpayment of income and excess profits taxes for the years 1944 to 1948, both inclusive, in the amount of $9,472,157.80, plus interest allowed by law. Under orders of the Securities and Exchange Commission the predecessor of plaintiff American Natural Gas Company, both hereinafter referred to as "American", sold its stock in The Detroit Edison Company in the year 1948 at a loss. Plaintiffs, who filed consolidated tax returns for the years in question, allege that they are entitled to deduct this loss from ordinary income; whereas, the Commissioner of Internal Revenue allowed the loss only to the extent of the capital gains.
 
 
 2
 The issue presented is whether or not plaintiffs are entitled to deduct from their ordinary income the full amount of the loss.[1]
 
 
 3
 They are entitled to do so, if at all, only by virtue of section 117(j) of the Internal Revenue Code of 1939, as amended by the Revenue Act of 1942, 26 U.S. C.A. § 117(j). This section reads:
 
 
 4
 "(j) Gains and losses from involuntary conversion and from the sale or exchange of certain property used in the trade or business.
 
 
 5
 * * * * * *
 
 
 6
 "(2) General rule. If, during the taxable year, the recognized gains upon sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power or requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *"
 
 
 7
 Plaintiffs say that American sold its stock in the Detroit Edison Company under compulsion of an order of the Securities and Exchange Commission, and that the loss on the sale, therefore, comes within the provision of the statute relating to a "compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property * * *." Such a loss is deductible from ordinary income.
 
 
 8
 There can be no doubt that the conversion of the property in question was under compulsion, and we think it was involuntary, but we do not think it comes within the sort of compulsory or involuntary conversions described in the limiting clause, which is enclosed in parenthesis. It can only come within that involuntary conversion which is the result of a requisition of property or a condemnation thereof, or the threat or imminence of requisition or condemnation, and we do not think it was the result of either. American's ownership of the property had become unlawful after the passage of the Public Utility Holding Company Act, and, because it was unlawful, it was ordered to dispose of it. Defendant did not take it at all, neither for its own use nor for the use of another, nor did it threaten to do so.
 
 
 9
 This will become apparent from a reading of the Public Utility Holding Company Act of 1935 (49 Stat. 803), 15 U.S. C.A. § 79a et seq., and the circumstances surrounding the sale.
 
 
 10
 This Act directed the Securities and Exchange Commission to require all utility holding companies to simplify their corporate structure and to eliminate therefrom all holdings which were not necessary or appropriate to the operation of an integrated public utility system. Section 11(a) of the Act required the Commission "to examine the corporate structure of every registered holding company and subsidiary company thereof, the relationships among the companies in the holding-company system of every such company and the character of the interests thereof and the properties owned or controlled thereby to determine the extent to which the corporate structure of such holding-company system and the companies therein may be simplified, unnecessary complexities therein eliminated, voting power fairly and equitably distributed among the holders of securities thereof, and the properties and business thereof confined to those necessary or appropriate to the operations of an integrated public-utility system."[2]
 
 
 11
 Under section 11(b)(1) the Commission was charged with the duty "to require by order, after notice and opportunity for hearing, that each registered holding company, and each subsidiary company thereof, shall take such action as the Commission shall find necessary to limit the operations of the holding-company system of which such company is a part to a single integrated public-utility system, and to such other businesses as are reasonably incidental, or economically necessary or appropriate to the operations of such integrated public-utility system; * * *."
 
 
 12
 Any order made thereunder was made subject to judicial review. Under subsection (c) of section 11 it was required that any order issued should be complied with within one year, subject to the right in the Commission to extend the time. Under subsection (d) of section 11 the Commission was authorized to apply to a court for the enforcement of its orders.
 
 
 13
 Acting pursuant to the authority therein granted, the Securities and Exchange Commission on March 8, 1940 issued an order for a hearing directed to American and the other holding-companies forming a part of the system. The order recited that its system was not confined to a single integrated public utility system and, accordingly, ordered that hearings be commenced and that the companies be required to file an answer. The companies answered, asserting their right to continue their operations under their present system, but they nevertheless expressed a willingness to cooperate with the Commission, to avoid controversy, and, so, they proposed a plan for the disposition of certain properties of the system, and the grouping of the remaining assets into three geographical areas.
 
 
 14
 On June 13, 1941, the Commission issued a statement of tentative conclusions holding that the system as then constituted did not meet the standards of integration set out in the Public Utility Holding Company Act of 1935, and that, among other things, American's ownership of stock in the Detroit Edison Company must be disposed of. The Commission directed that the companies show cause why an order should not be entered in conformity therewith. The companies answered, vigorously protesting the Commission's proposed order, but the Commission, notwithstanding, on August 5, 1941, issued its decision directing, among other things, that American dispose of its Detroit Edison Company stock. The order provided that the companies should proceed "with due diligence to comply with the foregoing order, and shall make application to the Commission for the entry of any further orders necessary or appropriate for that purpose." Jurisdiction was retained for the entry of such orders as might seem necessary and appropriate.
 
 
 15
 The companies submitted their first plan on November 1, 1944, some three years later, and applied for its approval, but this was refused by the Commission on June 2, 1945.
 
 
 16
 On June 26, 1947, the companies filed another plan, known as Application 31. On September 2, 1947, the Commission delivered its opinion, in which it stated that the plan appeared to be deficient in not providing for prompt compliance with the original order of August 5, 1941. Thereupon, the companies filed an amendment to the plan on September 18, 1947. Hearings on this amended application were ordered.
 
 
 17
 On October 28, 1947, the companies filed a second amendment to the application, in which it was stated that the Detroit Edison stock would be disposed of by December 31, 1948, and proposed an immediate sale of 450,000 shares thereof. On November 19, 1947, the Commission issued an order in which it authorized the sale of the 450,000 shares of Detroit Edison stock.
 
 
 18
 Then, on December 30, 1947, the Commission entered an order approving application No. 31, as amended. It directed, among other things, that the Detroit Edison stock be disposed of, 450,000 shares in December 1947, 400,000 shares in May 1948, and 250,000 shares in October 1948, the balance to be distributed to the stockholders as dividends. In the meantime American had received a stock dividend from Detroit Edison of 128,920½ shares; the Commission ordered that these shares be disposed of in conformity with its order of August 5, 1941.
 
 
 19
 American sold 450,000 shares of the Detroit Edison stock in January 1948 at a price of $19.06 a share; in April 1948 it sold another 450,000 shares at a price of $19.73 a share; in August 1948 it sold 190,000 shares at a price of $20.01 a share; and in November 1948 it sold 192,734 shares at a price of $19.546 a share. The balance of the stock was distributed to its stockholders.
 
 
 20
 Plaintiffs say these sales were involuntary conversions which resulted from "an exercise of the power of requisition or condemnation or the threat or imminence thereof," as these words are used in section 117(j), supra. Plaintiffs concede that in order to receive the tax benefits of section 117(j), a compulsory or involuntary conversion must be one which results from one of those things mentioned in the parenthetical clause of that section, in this case, requisition or condemnation or the threat thereof; but they argue, first, that the order of divestment issued by the Securities and Exchange Commission was an exercise of the power of requisition or condemnation; or, in the alternative, they say, since the Act empowered the Commission to apply to a court to appoint a receiver to take over the assets of the company and enforce the order, that the order amounted to a threat to requisition or condemn the property.
 
 
 21
 We cannot agree. The order of the Securities and Exchange Commission was neither a requisition nor a condemnation, nor the threat of either. It was nothing more than an order by the Commission for plaintiffs to dispose of property the possession of which by plaintiffs was prohibited by the Public Utility Holding Company Act. It was an order for plaintiffs to comply with the law. The Act required that "the properties and business thereof [of a public utility system] confined to those necessary or appropriate to the operations of an integrated public-utility system"; the Commission thought that American's ownership of the Detroit Edison Company stock was not necessary for this purpose; and, so, it required American to dispose of that the possession of which by it was no longer lawful.
 
 
 22
 By no means can this be considered an exercise of the power of eminent domain. The United States did not take the property; it did not take it for public use or for any use at all. On the contrary, in ordering the sale of the stock, Congress was exercising, through the Securities and Exchange Commission, its constitutional power to regulate interstate commerce. The Supreme Court has held that the Public Utility Holding Company Act of 1935, which authorized such an order, was a valid exercise of such power. American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103; North American Co. v. Securities and Exchange Commission, 327 U.S. 686, 66 S.Ct. 785, 90 L.Ed. 945; Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 58 S.Ct. 678, 82 L.Ed. 936.
 
 
 23
 The purpose of the Act was to eliminate the evils then existing in public utility holding companies, and to protect the public from the abuses inherent in them as they were then constituted. It was an Act to promote the public welfare. It was no part of its purpose to condemn or to requisition the companies' property. The Supreme Court, in North American Co. v. Securities and Exchange Commission, supra, said that "Congress enacted the Public Utility Holding Company Act of 1935, 49 Stat. 803, 15 U.S.C.A. § 79 et seq. in order to correct grave abuses which it had found in the use of the holding-company device in the nation's electric and gas utility industries." It further said at pages 705-706 of 327 U.S., at page 796 of 66 S.Ct.:
 
 
 24
 "This broad commerce clause does not operate so as to render the nation powerless to defend itself against economic forces that Congress decrees inimical or destructive of the national economy.
 
 
 25
 * * * * * *
 
 
 26
 "Congress in § 11(b)(1) of the Public Utility Holding Company Act was concerned with the economic evils resulting from uncoordinated and unintegrated public utility holding company systems. These evils were found to be polluting the channels of interstate commerce and to take the form of transactions occurring in and concerning more states than one. Congress also found that the national welfare was thereby harmed, as well as the interests of investors and consumers. These evils, moreover, were traceable in large part to the nature and extent of the securities owned by the holding companies. Congress therefore had power under the commerce clause to attempt to remove those evils by ordering the holding companies to divest themselves of the securities that made such evils possible."
 
 
 27
 In the exercise of its regulatory powers Congress, of course must act within the limits imposed by the Constitution. If it exceeds these limits by taking private property without due process, then the regulatory statute is invalid. In the North American case, supra, the petitioner argued that section 11(b) (1) of the Public Utility Holding Company Act of 1935 was unconstitutional, in that it amounted to a taking of private property. The Court answered this at 327 U.S. 709, 66 S.Ct. at page 798 by stating:
 
 
 28
 "* * * there is no basis here for assuming that in limiting the scope of North American's operations there will be dispositions of securities for inadequate considerations, thereby raising a question as to whether there is a destruction of these values without just compensation. The Act does not contemplate or require the dumping or forced liquidation of securities on the market for cash. Under §§ 11(d) and 11 (e) of the Act, any divestment or reorganization plan must meet the standards of fairness and equitableness. In many instances this may involve no more than a distribution of the securities among the existing shareholders of the holding company. But should securities be sold for cash, speculation as to unfavorable market conditions cannot undermine the validity of § 11(b) (1). * *"
 
 
 29
 There is no contention that in the case at bar the securities had to be sold for less than their market value at the time of the sale.
 
 
 30
 The Public Utility Holding Company Act does not differ in principle from many other statutes that prohibit the possession of things which the legislative authority considers inimical to the public welfare; for instance, narcotics, whisky, firearms, property that is unsafe or unsanitary, or otherwise a nuisance, etc.
 
 
 31
 In Mugler v. State of Kansas, 123 U.S. 623, 8 S.Ct. 273, 301, 31 L.Ed. 205, it was argued that a Kansas prohibition statute constituted a taking of private property without just compensation, as required by the due process clause of the 14th Amendment. The Court, at pages 668-9, said: "As already stated, the present case must be governed by principles that do not involve the power of eminent domain, in the exercise of which property may not be taken for public use without compensation. A prohibition * * * upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit. * * * The power which the states have of prohibiting such use by individuals of their property as will be prejudicial to the health, the morals, or the safety of the public, is not, and, consistently with the existence and safety of organized society, cannot be, burdened with the condition that the state must compensate such individual owners for pecuniary losses they may sustain, by reason of their not being permitted, by a noxious use of their property, to inflict injury upon the community. The exercise of the police power by the destruction of property which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law. In the one case, a nuisance only is abated; in the other, unoffending property is taken away from an innocent owner."
 
 
 32
 See also Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523 (alterations of a bridge over a navigable stream); Samuels v. McCurdy, 267 U.S. 188, 45 S.Ct. 264, 69 L.Ed. 568 (making unlawful the possession of liquor purchased before the passage of the 18th Amendment); Corneli v. Moore, 257 U.S. 491, 42 S.Ct. 176, 66 L.Ed. 332 (prohibiting the transfer of liquor from the Government-bonded warehouse to the dwelling of the owner); United States v. Caltex, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (destruction of property to prevent capture by the enemy); and United States v. Central Eureka Mining Co., 357 U.S. 155, 78 S.Ct. 1097, 2 L.Ed. 2d 1228 (a prohibition on the mining of gold during a war emergency). In none of these cases was it held that there was a requisition or condemnation of the property.
 
 
 33
 Plaintiffs say that the term "requisition or condemnation" as used in the Act means something more than the exercise of the power of eminent domain. We do not think it does. It seems clear to us that the words mean the taking or the threat of taking property by some public or quasi-public corporation — by some instrumentality that has the power to do so against the will of the owner, and for the use of the taker. That is the common, well-recognized meaning of those words and there is nothing to indicate that Congress used them in any other sense. Plaintiffs were required to dispose of their property, but the United States did not take it, nor did it prevent plaintiffs from getting for it its full market value at the time of the taking.
 
 
 34
 Section 112(f) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 112(f), uses the same words as those with which we are concerned. Such a provision first appeared in the Revenue Act of 1921. They were used to take care of situations resulting from the sinking of ships by submarines or their requisition by the Government for its use, as is shown by the letter of the Secretary of the Treasury to the Committee on Ways and Means when the Revenue Act of 1918 was under consideration. It read, in part:
 
 
 35
 "During the war, in the case of property requisitioned for war purposes by the Government and property lost or destroyed in whole or in part, through war hazards, especially in the case of ships, it happened that at the time of the requisition or loss the market value of such ships was considerably increased over the cost * * * and that in practically no case would the taxpayer have been willing to sell the property for its appraised value at the time of requisition or loss.
 
 
 36
 "To require the taxpayer to pay income and war profits and excess profits taxes upon the difference between the cost * * * and the compensation received at the time of requisition or loss would have been to take such a large proportion of the amount received for the vessel that, although the owner desired to replace the same, the taking of the tax by the Government would have made it impossible in practically every instance."
 
 
 37
 This shows that when Congress set about to take care of situations arising from the involuntary conversion of property by destruction or the taking of it for governmental use, it used the words with which we are here concerned. This tends to support the view that Congress had in mind requisitions or condemnations under the power of eminent domain.
 
 
 38
 The Tax Court so understood these words in 112(f). See Dear Publication & Radio, Inc. v. Commissioner, 31 T.C. 1168. In a previous case, in Credit and Investment Corp. v. Commissioner, 47 B.T.A. 673, it also had so construed the words.
 
 
 39
 In the Dear Publication & Radio case there was involved a New Jersey statute which required the dissolution of a corporation in case of a deadlock among the management. In order to prevent this dissolution, the taxpayer sold his stock in the corporation. He claimed that this was an involuntary conversion through requisition or condemnation or the threat thereof within the meaning of 112(f). The Court of Appeals for the Third Circuit affirmed the Tax Court, holding that a sale under such conditions was not an involuntary conversion "under threat or imminence of requisition or condemnation." Dear Publication & Radio, Inc. v. Commissioner, 3 Cir., 274 F.2d 656, 657.
 
 
 40
 Plaintiffs say that the threat to resort to court for the appointment of a receiver, in case of failure to comply with the Commission's order, was a threat to requisition its property; but, manifestly, this is not so. The purpose of the appointment of a receiver was to force compliance with the Commission's order, not to take the property for public use. The order was issued to carry out the mandate of an Act passed pursuant to the power of Congress to regulate commerce, not under the power of eminent domain. Once the order was complied with and assurances given of future compliance, the property, or the amount received from a sale of any part of it, would be returned to its owner. No part of it was or would be taken for public use. None of it was requisitioned or condemned.
 
 
 41
 It results that plaintiffs' petition must be dismissed.
 
 
 42
 It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 If they are, they sustained a net operating loss in 1948, which they will be able to use as a carryback to the preceding taxable years to offset or reduce the income for those years and, hence, to recover some or all of the taxes previously paid for those years
 
 
 [2]
 An integrated public utility system was defined as one which "may be economically operated as a single interconnected and coordinated system confined in its operations to a single area or region, in one or more States, not so large as to impair * * * the advantages of localized management, efficient operation, and the effectiveness of regulation; * * *"
 
 
 
 43
 JONES, Chief Judge, and LITTLETON, Judge (Ret.), LARAMORE and MADDEN, Judges, concur.