**BEHR–MANNING CORPORATION, by Norton Company, Successor, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 60–89.**

United States District Court
D. Massachusetts.
July 20, 1961.

Roger P. Stokey, Frederick J. Robbins, Goodwin, Proctor & Hoar, Boston, Mass., for plaintiff.

Elliot L. Richardson, U. S. Atty., James C. Heigham, Asst. U. S. Atty., Boston, Mass., for defendant.

JULIAN, District Judge.

The defendant moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

The Norton Company, successor to the Behr-Manning Corporation, brings this action against the United States under the provisions of 28 U.S.C. § 1346(a) (1), as amended, to recover $322,219.72 which Norton paid to the District Director of Internal Revenue, Boston, Massachusetts, on March 7, 1958, for deficiencies in income and excess profits taxes for the years 1951 and 1952. Claims for refund contesting the deficiencies were filed on or about July 9, 1958, and disallowed by the District Director. Norton thereupon brought this suit.

In 1949 the United States brought a civil antitrust suit against Behr-Manning Corporation and five other defendants alleging violation of sections 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1, 2 (United States v. Minnesota Mining & Manufacturing Co. et al., D.C.Mass.1950, 92 F.Supp. 947). Behr-Manning and the other defendants held stock of the Durex Corporation which in turn owned several subsidiaries in foreign countries. The court found that Behr-Manning and the other defendants were violating section 1 of the Sherman Act and ordered the entry of a final decree (September 13, 1950) which provided in part as follows:

"8. Before C day the American manufacturing defendants [including Plaintiff] and Durex [The Durex Corporation] shall file in Court a proposed plan or series of plans whereby (a) Durex shall be dissolved, (b) the creditors of Durex shall be protected, (c) each of the Durex manufacturing subsidiaries [including Canadian Durex Abrasives, Ltd.] shall be dissolved or transferred to one but not more than one of the American manufacturing defendants or transferred to a party outside this case (provided that in no event shall the party to which Canadian Durex Abrasives, Ltd. is transferred also be the transferee of Durex Abrasives, Ltd. or Durex Schleifmittel, G.m.b.H. and further provided that in no event shall the party to which Durex Abrasives, Ltd. is transferred also be the transferee of Canadian Durex Abrasives, Ltd. or Durex Schleifmittel, G.m.b.H.), (d) each of the Durex subsidiaries which is not a Durex manufacturing subsidiary [including

Australian Durex Products Pty., Ltd., a non-manufacturing subsidiary] shall be dissolved or transferred to the Export Company or to one or more of the American manufacturing defendants or to other parties, and (e) the remaining assets of Durex and the assets of any of its subsidiaries which are to be dissolved shall be distributed fairly and equitably and in a manner that negates the probability of an unlawful monopoly or restraint of trade."

In its final decree the district court reserved jurisdiction to issue such further orders and directions as might be appropriate for the carrying out of the decree or plans adopted for compliance with the decree. The defendants' plan of compliance, approved by the court on March 12, 1951, provided that Durex was to acquire for cash, and retire, all of the capital stock in Durex owned by Behr-Manning, and by another defendant, and that Durex was to transfer the entire capital stock of its Australian and Canadian subsidiaries to Behr-Manning. The plan was carried out. On April 27, 1951, Behr-Manning transferred its Durex stock to Durex for $1,445,391 in cash and on the same day Durex transferred the stock of its Australian and Canadian subsidiaries to Behr-Manning for $1,364,232 in cash. The difference of $81,159 between these amounts, together with an additional sum, was later in 1951 paid by Behr-Manning to Durex in discharge of a debt owed by the Australian subsidiary.

For purposes of income and excess profits taxes Behr-Manning had a basis of $604,608 in the Durex stock.

Returns were filed by the plaintiff for 1951 and 1952. Upon audit of the 1951 return the Commissioner of Internal Revenue determined that the gain of $840,783 received by Behr-Manning on the transfer of the Durex stock was taxable as a long-term capital gain in 1951. This determination produced the deficiencies for the years 1951 and 1952 which the plaintiff paid and now seeks to recover.

The plaintiff contends that its sale of the stock of Durex pursuant to the court's final decree and the plan of compliance approved by the court was a compulsory or involuntary conversion that resulted from "requisition or condemnation or threat or imminence thereof" within the meaning of section 112(f) of the Internal Revenue Code of 1939,[1] and that the gain

---

1. "Sec. 112. Recognition of gain or loss.
   (a) *General Rule.* Upon the sale or exchange of property the entire amount of the gain or loss, determined under Section 111, shall be recognized, except as hereinafter provided in this section.
       \*   \*   \*   \*   \*
   "(f) [As amended by Sec. 1, Act of October 31, 1951, c. 661, 65 Stat. 733.] *Involuntary Conversion.* If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—
   "(1) *Conversion into similar property.* Into property similar or related in service or use to the property so converted, no gain shall be recognized.
   "(2) *Conversion into money where disposition occurred prior to 1951.* \* \* \* For the purposes of this paragraph and paragraph (3), the term 'disposition of the converted property' means the destruction, theft, seizure, requisition, or condemnation of the converted property, or the sale or exchange of such property under threat or imminence of requisition or condemnation.
   "(3) *Conversion into money where disposition occurred after 1950.* Into money or into property not similar or related in service or use to the converted property, and the disposition of the converted property (as defined in paragraph (2)) occurred after December 31, 1950, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:
   "(A) *Nonrecognition of Gain.* If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition or control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless

realized from the sale should not have been recognized and taxed.

The defendant takes the position that the plaintiff's sale of the stock to another private person under the compulsion of the antitrust decree was not a conversion that resulted from a "requisition or condemnation" of the stock by the government, or from the "threat or imminence thereof," within the meaning of the statute. The defendant asserts that Congress did not intend the words "requisition or condemnation" to be given a meaning broader than a taking by the government under its power of eminent domain.

■ It is clear that Behr-Manning divested itself of the ownership of the Durex stock because it was compelled to do so by the court's decree. The presence of the element of compulsion by governmental action, however, is not alone enough to satisfy the statute. The conversion must take place "as a result of * * * requisition or condemnation or threat or imminence thereof."

■ There appears to be nothing in the history of the use of the words "requisition" and "condemnation" in statutes or in judicial decisions that suggests that either word has a meaning broad enough to encompass the divestiture here involved. The construction urged by the government, on the contrary, not only accords with the generally accepted usage of the two words but is also supported by the legislative history of section 112 (f) and by judicial decisions. For the legislative history of the section see Treasury Regulations 45 (1919 ed.), Article 49; sections 214(a) (12) and 234 (a) (14) of the Revenue Act of 1921, c. 136, 42 Stat. 227; section 203(b) (5) of the Revenue Act of 1924, c. 234, 43 Stat. 253; section 1(a) of the Act of October 31, 1951, c. 661, 65 Stat. 733; H.Rep.No. 798, 82d Cong., 1st Sess., pp. 1–4; S.Rep. No. 1052, 82d Cong., 1st Sess., pp. 1–4.

of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock.

In section 203(b) (5) of the Revenue Act of 1924, c. 234, 43 Stat. 253, which remained unchanged until 1951, the language of the provision was as follows:

"(5) If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted * * *."

Section 1(a) of the Act of October 31, 1951, c. 661, 65 Stat. 733, amended section 112(f) by dividing it into three numbered paragraphs and adding the provisions of section 112(f) (3). The words "an exercise of the power of" were eliminated from the parenthetical phrase. There was no Congressional intent to change the substance of the phrase. See H.Rep. No. 798, 82d Cong., 1st Sess., pp. 2–3; S.Rep. No. 1052, 82d Cong., 1st Sess., p. 2.

The enactment by Congress of separate provisions to cover situations in which an owner is required to dispose of his property, but where the property itself is not taken by the government, is an added indication that Congress did not believe that section 112(f) was applicable to every case in which an owner was required by governmental action to dispose of his property. See sections 371–373, Revenue Act of 1938, c. 289, 52 Stat. 447, which later became sections 112(b) (8), 113(a) (17), and Supplement R of the 1939 Code, (transactions consummated in obedience to orders of the Securities and Exchange Commission under section 11 of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79k); see also section 123, Revenue Act of 1943, c. 63, 58 Stat. 44, which added section 112(m) to the 1939 Code, (sales or exchanges certified by the Federal Communications Commission as necessary or appropriate to effectuate its policies with respect to the ownership of radio broadcasting stations).

Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. * * * * "

The meaning of the terms "requisition" and "condemnation" was considered in Filbin Corporation v. United States, D.C.E.D.S.C.1920, 266 F. 911. This case was decided when the Revenue Act of 1921 was in process of enactment. In holding that the requisition of private property entitled the owner to a jury trial on the amount of his compensation, the court stated, at page 913:

"Whether you call it a 'requisition' or a 'condemnation,' if the result be the taking from the individual of property and subjecting it to the public use, the result is the same, and the proceeding is in substance the very same. In ordinary parlance —perhaps in legal parlance—the word 'requisition' is the more often used in reference to the taking of personal property, and the word 'condemnation' to the taking of real estate."

In Jackson v. State of New York, 1914, 213 N.Y. 34, 35, 106 N.E. 758, L.R.A. 1915D, 492, Cardozo, J., referred to condemnation as an "enforced sale" in which "the state stands toward the owner as buyer toward seller."

Two recent cases lend particularly strong support to the government's contention. In Dear Publication & Radio, Inc. v. Commissioner of Internal Revenue, 3 Cir., 1960, 274 F.2d 656, the court held that the sale of stock of a corporation pursuant to a state "deadlock" statute providing for the dissolution of the corporation in the event of a stalemate between equally divided directors and shareholders, was not the result of a "requisition or condemnation or threat or imminence thereof" within the meaning of section 112(f) of the Internal Revenue Code of 1939. The taxpayer asserted that a "requisition" within the purview of section 112(f) did not require a taking for "public use" and that the judgment of the state court dissolving the corporation would have resulted in the "condemnation" of the taxpayer's interest in the stock. The court rejected this contention, stating that there is no element of the exercise of sovereign powers of "requisition" or "condemnation" in a judicially decreed dissolution of a corporation under the "deadlock" statute.

In American Natural Gas Co. et al. v. United States, Ct.Cl.1960, 279 F.2d 220, certiorari denied, 364 U.S. 900, 81 S. Ct. 232, 5 L.Ed.2d 193, a case strikingly similar to ours, the court held that a sale of stock resulting from a divestiture order issued by the Securities and Exchange Commission under the Public Utility Holding Company Act was not an involuntary conversion resulting from "requisition or condemnation or the threat or imminence thereof." In so holding, the court stated, 279 F.2d at page 221:

"American's ownership of the property had become unlawful after the passage of the Public Utility Holding Company Act, and, because it was unlawful, it was ordered to dispose of it. Defendant did not take it at all, neither for its own use nor for the use of another, nor did it threaten to do so."

and again, at page 223:

"The order of the Securities and Exchange Commission was neither a requisition nor a condemnation, nor the threat of either. It was nothing more than an order by the Commissioner for plaintiffs to dispose of property the possession of which by [the] plaintiffs was prohibited by the Public Utility Holding Company Act. It was an order for plaintiffs to comply with the law."

█ I construe the words "requisition or condemnation" in section 112(f) to mean a taking of property by public authority for public use. No interest of any kind was either taken or acquired by the government in the Durex stock owned by Behr-Manning. The divestiture, therefore, was not the result of requisition or condemnation or threat or imminence thereof within the meaning of section 112(f).

The motion is granted. It is ordered that judgment be entered for the United States.