ROBERT W. CARVER AND DIANA CARVER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Carver v. Commissioner
Docket No. 4553-82.
United States Tax Court
T.C. Memo 1985-454; 1985 Tax Ct. Memo LEXIS 176; 50 T.C.M. (CCH) 929; T.C.M. (RIA) 85454; August 28, 1985. Leon C. Misterek, for the petitioners. Henry Thomas Schafer and Peter R. Hochman, for the respondent. PARKER
MEMORANDUM FINDINGS OF FACT AND OPINION PARKER, Judge: Respondent determined a deficiency of $325,376 in petitioners' 1978 Federal income tax. Respondent also determined additions to tax of $15,372 under section 6651(a) [1] and $16,269 *177 under section 6653(a). Following a protracted management dispute culminating in litigation over petitioner Robert Carver's loss of voting control of Phase Linear Corporation and his ouster as its president, the corporation purchased Mr. Carver's shares. After numerous concessions, the sole issue remaining for decision is whether the sale of his shares constituted an involuntary conversion under section 1033 so as to defer recognition of the gain on the sale. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Petitioners Robert W. Carver and Diana Carver resided in Snohomish, Washington at the time they filed their petition in this case. Petitioners filed a joint 1978 Federal income tax return (Form 1040) with the Internal Revenue Service Center at Ogden, Utah. In 1969, petitioner Robert W. Carver (hereinafter petitioner), [2] an electronics engineer and inventor, formed a partnership with Steven *178 M. Johnston to develop, manufacture, and market stereo sound equipment. In 1971, the partnership was incorporated in the State of Washington under the name of Phase Linear Corporation (Phase or the corporation). Petitioner held 51 percent of the corporation's shares, and Steven Johnston held the remainder. Phase undertook a recapitalization in 1974 to obtain additional financing. As a result, Phase's outstanding shares were held as follows: Shareholder
Shares
Percentage
Petitioner
97,500
41%
Steven Johnston
85,750
36%
Futura Corporation
51,250
22%
Greg Johnston
3,000
1%
At the time of this recapitalization, petitioner and Steven Johnston (hereinafter Johnston) executed a voting trust agreement granting petitioner voting control over 33,500 of Johnston's Phase shares, thus maintaining petitioner's voting control of the corporation. The voting trust agreement included two agreements, one between petitioner and Johnston (the shareholders' *179 agreement) and another to which Phase, petitioner as trustee and Johnston were parties (voting trust agreement), both referred to herein in the singular as the voting trust agreement. In addition to the voting trust agreement between petitioner and Johnston, there was also an agreement between Johnston and the corporation providing for Johnston to render consulting services to the corporation after he terminated his employment as he then planned to do. Under the voting trust agreement, petitioner's voting control over 33,500 of Johnston's Phase shares would terminate upon one of several events, including the termination of the consulting agreement that Phase had with Johnston. [3] So long as petitioner controlled a majority of the corporation's issued and outstanding capital stock, [4] he served as its president. *180 Following the 1974 recapitalization, Phase's directors began experiencing disagreements. Petitioner as the founder and equipment designer viewed Phase as essentially his own corporation, and he wanted simply to go on designing and building amplifiers "forever and always." Johnston and the other directors became dissatisfied with petitioner's performance as president of Phase, because of petitioner's failure to provide sufficient long-term planning and new product development, his interference with the corporation's marketing activities, and his engaging in the design of products for competitor companies. Moreover, Johnston and the other directors wanted to strengthen and "groom" Phase for future sale, which petitioner strongly opposed. These directors attempted without success and for about a year and a half to reconcile their differences with petitioner. For example, Johnston and Futura Corporation offered to sell their shares back to the corporation or to petitioner. Futura Corporation also offered to buy petitioner's shares. Apparently petitioner was opposed to any changes of this nature. At a meeting of Phase's board of directors held on October 17, 1977, a majority of *181 the directors adopted a resolution to terminate the consulting agreement between the corporation and Johnston. [5] The directors recognized that termination of the consulting agreement would also terminate the voting trust agreement by which petitioner held voting control of Phase. At the same meeting, and following its termination of the voting trust agreement, the board of directors voted to terminate petitioner as Phase's president. The directors, other than petitioner, had carefully orchestrated these actions before the board of directors' meeting. After his termination as Phase's president, petitioner was retained nominally as director of research and development. He received his salary ($80,000 annually) through March 17, 1978. Although the insurgent directors knew that petitioner often worked nights and weekends, they had the locks to Phase's facilities changed without giving petitioner a key. They were concerned that petitioner might *182 remove equipment from the premises. Whatever the directors' motives for formally retaining petitioner in a technical capacity, petitioner performed little or no services for Phase following his ouster as president. As a result of the board's termination of the consulting agreement thereby triggering the termination of the voting trust agreement and petitioner's ouster as president of the corporation, petitioner filed a lawsuit on November 16, 1977 against Phase and its various officers and directors. Petitioner's lawsuit claimed that these actions constituted a breach of contract, a breach of fiduciary duty by the directors, conspiracy, and tortious interference with the directors' contractual relationship. Specifically, petitioner contended that the board's attempt to terminate the consulting agreement was ineffective, so that the voting trust agreement remained in effect. Petitioner sought to have the voting trust agreement specifically enforced, including a preliminary injunction against Phase and its officers and directors to regain control of the corporation. His request for an injunction was denied. After long and hard negotiations between counsel for both sides, the *183 lawsuit was settled on March 28, 1978. In settlement petitioner and Phase entered into a stock redemption agreement whereby Phase purchased his shares and they also entered into other related agreements, referred to in the singular as the settlement agreement. Under the settlement agreement, the corporation paid petitioner $1,070,000 for settlement of the lawsuit, for his release of all claims against the company, and his surrender of his 72,500 shares of common stock to the corporation. [6] Although petitioner had not wanted to sell his shares, he did so on the advice of his attorney that his lawsuit at best would be long and costly and that he might ultimately lose. In late April or early May of 1978, Phase was approached by representatives of U.S. Pioneer Corporation regarding a sale of the corporation. In August of 1978, U.S. Pioneer Corporation purchased *184 all of the shares of Phase. Following Phase's redemption of his shares, petitioner deposited the $1,000,000 in the bank [7] and began again the manufacture and sale of stereo equipment. He initially operated the new business as a sole proprietorship. He incorporated his new business as the Carver Corporation (Carver) in the fall of 1978. Carver was wholly owned by petitioner. Carver manufactured and sold stereo amplifiers and preamplifiers essentially identical to those made and sold by Phase. The patents for Phase's products were owned by petitioner, and in settling his lawsuit, he granted Phase a nonexclusive license. The balance sheet on Schedule L of Carver's Small Business Corporation Income Tax Return (Form 1120-S) for 1978 shows total assets of $76,680, capital stock of $10,000, and shareholder loans of $130,723. During the calendar years 1978 through 1982, the relative market shares for amplifiers and preamplifiers sold by Phase and Carver, expressed as a percentage of market dollar volume, were *185 as follows: Power Amplifiers
1982
1981
1980
1979
1978
Carver
15.1
11.2
1.2
0 0 Phase
4.5
3.4
8.5
12.2
16.2
Preamplifiers
1982
1981
1980
1979
1978
Carver
13.3
19.7
8.5
0 0 Phase
3.3
3.1
6.7
20.0
17.4
On Schedule D, Part II, line 6 of the joint 1978 return he filed with Mrs. Carver, petitioner reported no gain from his sale of the Phase stock because he determined that the sale was an "involuntary conversion" within the meaning of section 1033. Petitioner reported a gross sales price of $1,070,000 and claimed a basis of $70,000. In his statutory notice, respondent determined that petitioner's sale of his Phase shares did not qualify for nonrecognition under section 1033. Respondent disallowed petitioner's claimed basis, which was in fact a nondeductible lump-sum payment to his former spouse, and recharacterized various claimed deductions as selling expenses reducing the gain on the stock sale; petitioner has conceded these adjustments. Respondent determined that the total gain was $1,037,787, allowed the section 1202 capital gains deduction, and determined a net taxable *186 gain on the stock redemption of $518,893. The parties having stipulated in regard to the various adjustments in the statutory notice, including the late filing and negligence additions, the only issue remaining for decision by the Court is whether the $1,037,787 of gain realized from the sale or redemption of the stock qualifies for nonrecognition under section 1033 as an involuntary conversion. OPINION Section 1033 permits a taxpayer to defer recognition of gain where the property has been involuntarily converted, to the extent that the taxpayer either receives property similar or related in service or use ("qualifying property") or rolls over the conversion proceeds into qualifying property.[8] The statute specifically enumerates the kinds of dispositions that constitute involuntary conversions: (1) destruction in whole or part; (2) theft; (3) seizure; or (4) requisition or condemnation or threat or imminence thereof. Sec. 1033(a).The threat or imminence clause applies only to a requisition or condemnation of property by governmental authority for public use; it does not apply to the other enumerated conversions. Hitke v. Commissioner,296 F. 2d 639, 644 (7th Cir. 1961), *187 affg. a Memorandum Opinion of this Court; American Natural Gas Company v. United States,150 Ct. Cl. 572, 279 F. 2d 220, 225-226 (1960), cert. denied 364 U.S. 900 (1960); Dear Publication & Radio, Inc. v. Commissioner,31 T.C. 1168, 1173-1174 (1959), affd. 274 F. 2d 656 (3d Cir. 1960). *188 The courts have consistently denied nonrecognition under section 1033 (and its predecessors) to taxpayers selling stock to the corporation or to other shareholders in resolution of shareholder and/or management disputes. In Dear Publication & radio, Inc. v. Commissioner,supra, a leading case on this issue, a dispute between the two 50-percent shareholders had deadlocked the corporation, resulting in state proceedings under the New Jersey "deadlock" statute for the involuntary dissolution of the corporation. The other shareholder purchased the taxpayer's shares pursuant to a competitive bidding agreement under which each shareholder bid on the other's shares. We found that there was no "requisition" or "condemnation" within the meaning of the statute and that the stock disposition was a voluntary sale rather than an involuntary conversion. See also Hitke v. Commissioner,supra;Robins v. Commissioner,15 B.T.A. 1068 (1929); Tirrell v. Commissioner,14 B.T.A. 1399 (1929). We think that the rationale of these decisions is sound, and we are unpersuaded by the purported distinctions raised by petitioner. We do not *189 think that petitioner's sale of his shares of Phase Linear Corporation back to the corporation can be characterized as involuntary. A conversion is involuntary only when it is "wholly beyond control of the one whose property has been taken." Dear Publication & Radio, Inc. v. Commissioner,supra, 274 F. 2d at 660. See also Wheeler v. Commissioner,58 T.C. 459, 463 (1972). Petitioner's desire not to sell his Phase shares does not make his ultimate sale of them involuntary. In Robins v. Commissioner,supra,15 B.T.A. at 1072, we stated: Petitioner contends that his investment was faced with ruin unless he sold his stock [to the majority shareholder] and that such state of facts may bring his case within the intendment of [the predecessor to section 1033]. We think the statute did not have an intent of application such as claimed for it by petitioner. No doubt as a business expediency petitioner acted with foresight in selling his stock, bearing in mind the conditions that obtained. Viewed in the light of his legal rights, he *190 was under no compulsion to sell. He could have stood on his rights and demanded such a disposition of his stock ownership as justice might have required. That observation is equally appropriate in this case. Petitioner could have "stood on his rights" and awaited adjudication of his lawsuit against Phase and its directors. His prudent business decision to settle his lawsuit and sell his stock was just that--his decision. It was in no sense involuntary. We also note that petitioner's predicament itself was not wholly beyond his control. Petitioner must have been aware of the growing discord among Phase's management. Petitioner had the opportunity to purchase the shares of Johnston and Futura Corporation and thereby ensure his complete control of Phase. His seeming inattention to these internal problems no doubt led to the insurgent directors' successful coup. We also do not think that petitioner's disposition of his Phase shares was a "conversion" within the meaning of the statute. A stock sale, even though compelled by economic, business, or personal considerations, does *191 not constitute an involuntary conversion within the terms of section 1033. Hitke v. Commissioner,supra,296 F. 2d at 644. See also Dorothy C. Thorpe Glass Mfg. Corp. v. Commissioner,51 T.C. 300, 305-306 (1968). Petitioner argues that the board's actions in effecting the termination of the voting trust agreement that gave petitioner voting control and firing him as president resulted in a diminution of the value of his shares and that this diminution of value was a "partial destruction," within the meaning of section 1033. We disagree for several reasons. First, we think the "destruction" contemplated by section 1033(a) is something more than petitioner's subjective view that the value of his stock had diminished. We do not think that the value of petitioner's Phase shares was diminished in any way. There is certainly no evidence that petitioner's shares had ever been worth more than the $1,070,000 Phase paid for them. Petitioner's rights under the voting trust agreement giving him voting control of Phase constituted an asset separate and apart from petitioner's shares. These rights were personal to petitioner, not rights incident to *192 his ownership of stock. Indeed, these rights did not attach to petitioner's shares, nor were the rights lost if petitioner disposed of his own shares. See footnote 3, supra.
Moreover, we do not think that these rights under the voting trust agreement were destroyed. If, as petitioner contended in his lawsuit against Phase and its directors, the board's attempt to terminate the voting trust was ineffective, then these rights had not been destroyed (in whole or in part) but were disposed of by the settlement agreement and petitioner's voluntary sale. If, on the other hand, the board's actions were effective, then petitioner's voting rights were extinguished or had ceased to exist pursuant to, and in the manner prescribed by, the voting trust agreement that created such rights. See footnote 3, supra.
Finally, we do not think that a diminution in value, without regard to its cause, is a destruction within the meaning of the statute. "Congress clearly intended to extend the benefits of section 1033 and its predecessors only to public takings and casualty-like conversions * * *. *193 " Wheeler v. Commissioner,supra,58 T.C. at 463. See also H. Rept. No. 486, 67th Cong., 1st Sess. (1921), 1939-1 C.B. (Part 2) 206, 209; S. Rept. No. 275, 67th Cong., 1st Sess. (1921), 1939-1 C.B. (Part 2) 181, 191. By no stretch of the imagination can the board's actions be analogized to a "casualty." [9]
In conclusion, we cannot find petitioner's sale of stock to be an involuntary conversion within the meaning of section 1033. Accordingly, to reflect the above holding and the parties' concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the taxable year in question.↩
2. The shares of stock, the disposition of which is at issue in this case, were Mr. Carver's separate property. Consequently, Mrs. Carver is a party only because she filed a joint return with her husband.↩
3. Other terminating events included the passage of time (10 years), petitioner's death or incapacity, petitioner's refusal to act as voting trustee, Phase's failure to perform as required under the consulting agreement, Phase's merger, sale of assets or issuance of additional stock, and mutual recission. Petitioner's disposal of his own Phase shares was not a terminating event. ↩
4. In 1976, petitioner was divorced from his former wife, Sharon Carver. Although Sharon Carver was awarded 25,000 shares of Phase in the property settlement, she also gave petitioner the power to vote her shares, thus preserving petitioner's voting control.↩
5. The record is not wholly clear as to whether petitioner was present during that vote and, if so, whether he cast a vote. In any event, he opposed that termination and he did cast a vote against his ouster as president of Phase.↩
6. Some of the individual defendants in petitioner's lawsuit had filed counterclaims against him, and there were mutual releases of these various claims and counterclaims. Petitioner also agreed to terminate the voting trust agreement under which he had the power to vote the 25,000 Phase shares owned by his ex-wife, Sharon.↩
7. Apparently, $70,000 of the total amount paid by Phase went to petitioner's ex-wife as a lump sum alimony payment under the spouses' property settlement agreement.↩
8. Section 1033 provides in pertinent part: (a) General Rule.--If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted-- (1) Conversion into Similar Property.--Into property similar or related in service or use to the property so converted, no gain shall be recognized. (2) Conversion into money.--Into money or into property not similar or related in service or use to the converted property, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph: (A) Nonrecognition of Gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock. Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. * * * (B) Period within which property must be replaced.--The period referred to in subparagraph (A) shall be the period beginning with the date of the disposition of the converted property, or the earliest date of the threat or imminence of requisition or condemnation of the converted property, whichever is the earlier, and ending-- (i) 2 years after the close of the first taxable year in which any part of the gain upon the conversion is realized, or (ii) subject to such terms and conditions as may be specified by the Secretary, at the close of such later date as the Secretary may designate on application by the taxpayer. Such application shall be made at such time and in such manner as the Secretary may by regulations prescribe. * * * (E) Definitions.--For purposes of this paragraph-- (i) Control.--The term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. (ii) Disposition of the Converted Property.--The term "disposition of the converted property" means the destruction, theft, seizure, requisition, or condemnation of the converted property, or the sale or exchange of such property under threat or imminence of requisition or condemnation.↩
9. We recognize that subjectively petitioner may very well have viewed his loss of control of "his corporation" and his ouster as president as a personal catastrophe in his life. As one of the other directors sensitively described petitioner's attachment to the corporation: "Phase Linear was like one of his arms or one of his legs." While the Court can sympathize with his personal sense of loss, that clearly does not bring his case within the contemplation of section 1033↩.