WRONSKI v SUN OIL COMPANY

KOZIARA v SUN OIL COMPANY

Docket Nos. 77-241, 77-242. Submitted January 10, 1978, at Detroit.—
Decided March 19, 1979. Leave to appeal applied for.

Plaintiffs Walter F. Wronski and Eleanor J. Wronski and plain-
tiffs Eugene Koziara and Aniela Koziara, owners of certain real
property and the attendant mineral rights in St. Clair County,
commenced two separate actions against Sun Oil Company and
William J. Mielke and Gerald A. Perkins seeking rescission *ab
initio* of their oil and gas leases with Sun Oil coupled with an
accounting or, in the alternative, both compensatory and exem-
plary damages for Sun Oil's overproduction of oil from the pool
beneath plaintiffs' properties. At the time of the alleged over-
production, there was a proration order in effect from the
Supervisor of Wells of the Department of Natural Resources
limiting the production of oil from the pool in question. The
plaintiffs alleged that Sun Oil illegally overproduced more than
180,000 barrels of oil from the pool and that the illegally
overproduced oil was drained from beneath the plaintiffs' lands.
The cases were consolidated for trial.

The St. Clair Circuit Court, Halford I. Streeter, J., found that
Sun Oil had intentionally and illegally overproduced 150,000
barrels of oil and that 50,000 barrels of this oil had been
drained from plaintiffs' properties. The court held that this

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur 2d, Courts §§ 103, 123.
  2 Am Jur 2d, Administrative Law § 776 *et seq.*
[2, 3] 38 Am Jur 2d, Gas and Oil §§ 157, 158.
[4] 5 Am Jur 2d, Appeal and Error § 841
[5] 18 Am Jur 2d, Conversion § 1.
[6] 38 Am Jur 2d, Gas and Oil § 4.
[7] 38 Am Jur 2d, Gas and Oil §§ 164, 165.
[8] 38 Am Jur 2d, Gas and Oil §§ 286, 302.
[9] 38 Am Jur 2d, Gas and Oil §§ 161, 302.
[10] 38 Am Jur 2d, Gas and Oil § 302.
[11, 12] 22 Am Jur 2d, Damages §§ 236, 237.
[13] 18 Am Jur 2d, Conversion § 87.
[14] 17 Am Jur 2d, Contracts §§ 458, 482.

overproduction and drainage constituted tortious breaches of Sun Oil's contractual obligations under the oil and gas leases entered into with the plaintiffs and violated the plaintiffs' common-law right to the oil beneath their properties. The trial court refused to rescind the leases, but awarded compensatory and exemplary damages. The defendants appeal alleging that the findings of the trial court are contrary to the great preponderance of the evidence, that an improper formula for compensatory damages was applied and that the circuit court lacked jurisdiction. Plaintiffs cross-appeal alleging that rescission should have been granted, that an improper formula for compensatory damages was applied and that the exemplary damages awarded were inadequate. *Held:*

1. Jurisdiction over violation of rules and regulations issued by a state agency lies with a court of general jurisdiction, even when the agency has exclusive regulatory powers. The trial court's inherent jurisdiction to hear this claim had not been transferred to the Supervisor of Wells. The circuit court was within its jurisdiction in hearing and deciding this case.

2. The doctrine of primary jurisdiction is inapplicable in this case because the office of the Supervisor of Wells was not established to provide a forum for individuals alleging injury caused by waste in violation of procedures established by the Supervisor of Wells. Jurisdiction for such matters has remained in the circuit courts.

3. The Court of Appeals is not convinced that had it been the trier of fact it would have reached a different conclusion based on the evidence presented, and does not reverse or modify the findings of the trial court. A review of the record discloses sufficient facts upon which the trial court could find that Sun Oil systematically, intentionally and illegally overproduced oil in an amount of 150,000 barrels from the wells in question.

4. Violation of the proration order constituted conversion of oil from the pool, thereby subjecting Sun Oil to liability to all the owners of interest in the pool for conversion of the illegally obtained oil. The finding of the trial court that Sun Oil is liable to plaintiffs for the conversion of 50,000 barrels of oil is affirmed.

5. The trial court used an improper method of calculating the value of the oil converted. Since Sun Oil was an intentional and wilful convertor and since the oil was produced in violation of the leases, the "harsh" rule for calculating the value should have been applied, and the plaintiffs should have been awarded

the value of the oil at the time of conversion without any credit to Sun Oil for expenses incurred in producing the oil.

6. The addition of exemplary damages was also improper. Exemplary damages are compensatory in nature and not punitive. The exemplary damages awarded in this instance were actually punitive. The application of the "harsh" rule of damages includes an amount for punitive damages and they may not be assessed twice.

7. The price per barrel of oil converted did not properly reflect the value of the oil for the period during which the conversion took place. The doctrine that the measure of damages for conversion of goods that fluctuate in value is the highest value between conversion and judgment has never been applied in Michigan. The highest price for the period of conversion should have been utilized for measuring damages.

8. The grant or denial of rescission of the leases was within the discretion of the trial court. Plaintiffs have been adequately compensated by the damage award. Rescission would not be appropriate in this instance.

Affirmed in part, reversed in part and remanded.

1. ACTION — TORTS — JURISDICTION — STATE AGENCIES — COURTS OF GENERAL JURISDICTION.

Jurisdiction for tortious causes of action based upon violation of rules or regulations issued by a state agency lies with a court of general jurisdiction, even where the agency has exclusive regulatory powers.

2. MINES AND MINERALS — GAS AND OIL — SUPERVISOR OF WELLS — WASTE — STATUTES.

It is the function of the Supervisor of Wells to protect the interests of the state's citizens and land owners from unwarranted waste of gas and oil and foster the development of the industry along the most favorable conditions and with a view to the ultimate recovery of the maximum production of these natural products (MCL 319.1; MSA 13.139[1]).

3. MINES AND MINERALS — GAS AND OIL — SUPERVISOR OF WELLS — JURISDICTION — DEPARTMENT OF NATURAL RESOURCES — STATUTES.

The act creating the position of the Supervisor of Wells within the Department of Natural Resources is forward looking with a purpose to prevent waste from occurring and is not intended to provide a forum for individuals alleging injury caused by waste in violation of its established procedures (MCL 319.6[a]; MSA 13.139[6][a]).

4. APPEAL AND ERROR — FINDINGS OF FACT — COURT RULES.

Findings of fact made by a trial court will not be set aside unless clearly erroneous (GCR 1963, 517.1).

5. CONVERSION — WRONGFUL DOMINION — PERSONAL PROPERTY.

Conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein.

6. MINES AND MINERALS — GAS AND OIL — OWNERSHIP — OWNERSHIP IN PLACE.

Ownership of gas and oil contained in the land is ruled in Michigan by the ownership in place theory; under this theory the nature of the interest of the landowner in oil and gas contained in his land is the same as his interest in solid minerals; solid minerals are a part of the land in or beneath which they are located and as a consequence the owner of land is also the owner of the gas or oil in or beneath it.

7. MINES AND MINERALS — GAS AND OIL — OWNERSHIP — FAIR-SHARE PRINCIPLE — STATUTES.

Michigan recognizes the "fair-share" principle of a landowner's property rights in gas and oil beneath his land; this principle allows each owner of property over a pool of gas or oil the opportunity to produce his just and equitable share of the oil and gas in the pool (MCL 319.13; MSA 13.139[13]).

8. MINES AND MINERALS — GAS AND OIL — CONVERSION — OVERPRODUCTION OF GAS AND OIL.

An oil company is liable for conversion of gas or oil if it can be said that the oil company overproduced from its wells in a given pool and the overproduction deprived other owners of the oil in the pool of their opportunity to claim and take the oil under their respective properties.

9. MINES AND MINERALS — GAS AND OIL — SUPERVISOR OF WELLS — CONVERSION — PRORATION ORDERS — OVERPRODUCTION OF GAS AND OIL.

An oil company's violation of a proration order issued by the Supervisor of Wells as to a specific pool of oil constitutes conversion of oil from the pool and subjects the violator to liability to all the owners of interests in the pool for conversion of the oil taken in violation of the order.

10. MINES AND MINERALS — GAS AND OIL — CONVERSION OF OIL — DAMAGES — HARSH RULE — MILD RULE.

The two rules as to the amount of damages for a conversion of oil

are 1) a wilful convertor is liable for the enhanced value of the oil at the time of conversion without deduction for expenses or for improvements by labor, and 2) an innocent or nonwilfull convertor is liable only for the value of the oil undisturbed, that is, he is entitled to set off the reasonable cost of production; these two rules are known respectively as the "harsh" rule and the "mild" rule.

11. Damages — Punitive Damages.
    Punitive damages are damages awarded solely to punish.

12. Damages — Exemplary Damages — Actual Damages.
    Exemplary damages are compensatory in nature and not punitive since they are an element of actual damages.

13. Conversion — Damages — Goods with Fluctuating Value — Highest Value.
    The doctrine that the measure of damages in an action for conversion of goods that fluctuate in value is the highest value between conversion and judgment has never been applied in Michigan.

14. Contracts — Courts — Rescission of Contract — Discretion — Trial Court.
    The grant or denial of a request for the rescission of a contract is not a matter of right, but rather lies within the discretion of the trial court.

*Sharp, Walsh, O'Sullivan & Beauchamp,* for plaintiffs.

*Loomis, Ewert, Ederer, Parsley, Davis & Gotting* (by *Lawrence J. Gagnon* and *Roger T. Ederer),* for defendants.

Before: Allen, P.J., and D. E. Holbrook, Jr., and M. J. Kelly, JJ.

D. E. Holbrook, Jr., J. Plaintiffs are the owners of 200 acres of land and the attendant mineral rights located in St. Clair County. Plaintiffs Koziara own two 20-acre tracts (Tracts 1 & 2) and one 40-acre tract (Tract 6). Plaintiffs Wronski own an 80-acre tract (Tract 7) and a 40-acre tract (Tract

13). These properties overlie the Columbus Section 3 Saline-Niagaran Formation Pool, and Tracts 2, 6 and 7 have producing oil wells. Tracts 6 and 7 are under lease to defendant Sun Oil Company.

The Supervisor of Wells, Michigan Department of Natural Resources, pursuant to the authority granted him by 1939 PA 61, as amended,[1] established 20-acre drilling units for the Columbus 3 pool, and provided for a uniform well spacing pattern.[2] The purpose of this order was to "prevent waste, protect correlative rights and provide for orderly development of the pool".[3] The supervisor, by a proration order effective February 1, 1970, further limited production in the Columbus 3 pool to a maximum of 75 barrels of oil per day per well. This order remained in effect until June 30, 1974, when Columbus 3 was unitized.

Defendant Sun Oil leases property from H. H. Winn (Tract 9) and from H. H. Winn, *et al* (Tract 12). Sun Oil has drilled several wells on these tracts in compliance with the uniform well spacing pattern, including well 1-C on Tract 9 and wells 3 and 6 on Tract 12. These three wells were operating during the effective date of the proration order and were subject to its terms. Plaintiffs contend that Sun Oil illegally overproduced more than

---

[1] Supervisor of wells act, MCL 319.1 *et seq.;* MSA 13.139(1) *et seq.*

[2] The Supervisor of Wells Order of May 22, 1969, established:
*"(B) DRILLING UNIT*
The drilling unit for wells drilled for oil and gas in the pool defined in (A) above shall be a tract of approximately 20 acres, rectangular in shape, formed by dividing a governmental surveyed quarter-quarter section of land into an east half and a west half thereof.
*"(C) WELL SPACING PATTERN*
Permits shall be granted for the drilling of wells for oil and gas in the pool defined in (A) above provided the wells are located in the center of the northeast one-quarter (NE1/4) or the center of the southwest one-quarter (SE1/4) of a governmental surveyed quarter-quarter section of land."

[3] Supervisor of Wells Order of May 22, 1969.

180,000 barrels of oil from these three wells, and that the illegally overproduced oil was drained from beneath plaintiffs' lands. They sought rescission *ab initio* of their oil and gas leases with Sun Oil coupled with an accounting, or in the alternative both compensatory and exemplary damages.

After a bench trial the court found that Sun Oil had intentionally and illegally overproduced 150,-000 barrels of oil, and that 50,000 barrels of this oil had been drained from plaintiffs' property. The court held that this overproduction and drainage constituted tortious breaches of Sun Oil's contractual obligations under the oil and gas leases entered into with plaintiffs, as well as violating plaintiffs' common-law rights to the oil beneath their property. The court refused to rescind the leases, but awarded compensatory and exemplary damages.[4] Sun Oil appeals contending that the

---

[4] The trial court awarded damages as follows:

"The Court finds that the 50,000 barrels of oil illegally drained from beneath the Wronski and Koziara tracts are to be valued at the rate of $12.50 per barrel, are to be allocated in accordance with their relative allocation factors based on the participation percentages set forth in Plaintiff's Exhibit No. 7 and reduced by the percentage royalty ownership of the respective Plaintiffs in each tract. The Court finds Koziara Tract No. 1 to have an allocation factor of .405% and a royalty ownership of 100%; Koziara Tract No. 2 to have an allocation factor of 13.212% and a royalty ownership of 20.83%; Koziara Tract No. 6 to have an allocation factor of 59.218% and a royalty ownership of 18.75%. The Court finds compensatory damages to be awarded the Plaintiffs Koziara against Defendant Sun Oil Company in the total amount of Eighty-Nine Thousand One Hundred Twenty-Seven and 00/000 ($89,127.00) Dollars.

"The Court finds the Wronski Tract No. 7 to have an allocation factor of 26.421% and a royalty percentage of 12.5%; the Wronski Tract No. 13 to have an allocation factor of .743% and a royalty interest of 100%. The Court finds compensatory damages to be awarded the Plaintiffs Wronski in the amount of Twenty-Five Thousand Two Hundred Eighty-Four and 00/100 ($25,284.00) Dollars and assessed against the Defendant Sun Oil Company.

\* \* \*

"The Court determines on the basis of all the testimony and evidence in this case and after considering the matters stated above, that it would be reasonable and proper to assess exemplary damages against

findings of the court are contrary to the great preponderance of the evidence, that an improper formula for compensatory damages was applied, that the award of exemplary damages was contrary to law and that the court lacked jurisdiction. Plaintiffs cross-appeal contending that rescission should have been granted, that an improper formula for compensatory damage was applied and that the exemplary damages awarded were inadequate.

Sun Oil contends that the Supervisor of Wells has exclusive jurisdiction over violations of rules and regulations issued pursuant to 1939 PA 61. This suit arose out of a claimed tortious violation of the proration order issued by the Supervisor of Wells. Jurisdiction for tortious causes of action based upon violation of rules or regulations issued by a state agency lies with a court of general jurisdiction, even when that agency has exclusive regulatory powers. *Valentine v Michigan Bell Telephone Co,* 388 Mich 19; 199 NW2d 182 (1972), *Muskegon Agency, Inc v General Telephone Co of Michigan,* 340 Mich 472; 65 NW2d 748 (1954). A fair reading of 1939 PA 61, as amended, does not indicate that the trial court's inherent jurisdiction has been transferred to the Supervisor of Wells.

Sun Oil further contends that the doctrine of primary jurisdiction enunciated in *White Lake Improvement Ass'n v City of Whitehall,* 22 Mich App 262; 177 NW2d 473 (1970), is applicable and

Defendant Sun Oil Company in the amount of Fifty (50%) per cent of the compensatory damages previously awarded to the Plaintiffs. The Court finds exemplary damages to be assessed against Defendant Sun Oil Company in the amount of Forty-Four Thousand Five Hundred Sixty-Three and 50/100 ($44,563.50) Dollars and awarded to plaintiffs Eugene H. Koziara and Aniela Koziara. The Court finds exemplary damages to be assessed against Defendant Sun Oil Company in the amount of Twelve Thousand Six Hundred Forty-Two ($12,642.00) Dollars and awarded to Plaintiffs Walter F. Wronski and Eleanor J. Wronski." Trial court opinion at 15-19.

that the trial court abused its discretion in not deferring decision in this matter to the Supervisor of Wells. The supervisor's function is to "protect the interests of its citizens and landowners from unwarranted waste of gas and oil and foster the development of the industry along the most favorable conditions and with a view to the ultimate recovery of the maximum production of these natural products". MCL 319.1; MSA 13.139(1).

In order to carry out this function the supervisor is empowered:

"To make and enforce rules subject to the approval of the commission, issue orders and instructions necessary to *enforce such rules* and to do whatever may be necessary with respect to the subject matter stated herein to carry out the purposes of this act, whether or not indicated, specified, or enumerated in this or any other section hereof." MCL 319.6(a); MSA 13.139(6)(a). (Emphasis supplied.)

The act is forward looking with a purpose to *prevent waste* from occurring and is not intended to provide a forum for individuals alleging injury caused by waste in violation of its established procedures.[5] The absence of authority by the Supervisor of Wells to decide the issue heard by the trial court makes the doctrine of primary jurisdiction inapplicable in this instance.

The findings of fact made by the trial court are challenged as against the great weight of the evidence. This case involves an action sounding in equity and was tried by the court without a jury.

---

[5] The act provides for criminal sanction under §§ 18 (b) and 19, MCL 319.18b; MSA 13.139(18b), MCL 319.19; MSA 13.139(19), and civil penalties under § 20, MCL 319.20; MSA 13.139(20), for violations of any rule, regulation or order issued in furtherances of the act. Specifically absent is any authority to award damages to any individual injured by violation of rules or orders issued by the supervisor.

The court made extensive findings of fact as required by GCR 1963, 517.1. The findings of fact made by the trial court will not be set aside unless clearly erroneous. GCR 1963, 517.1, *Rencsok v Rencsok,* 46 Mich App 250; 207 NW2d 910 (1973). Review of the record discloses sufficient facts upon which the trial court could find that Sun Oil systematically, intentionally and illegally produced the H. H. Winn, *et al,* No. 3 and No. 6 wells, and the H. H. Winn C-1 well in an amount of 150,000 barrels over that allowed by the proration order. The record also supports the finding that one-third of this illegally produced oil was drained from the property of the plaintiffs. We are not convinced that had this Court been the trier of fact that we would have come to a different result, and do not reverse or modify these findings. *Norton Shores v Carr,* 81 Mich App 715, 720; 265 NW2d 802 (1978).

The trial court found that Sun Oil's actions were intentional tortious breaches of its contractual obligation to both plaintiffs under their respective oil and gas leases. It found breaches of the implied convenant to prevent drainage as well as a failure to comply with the orders of the Supervisor of Wells as required by the provisions of the lease. It also found that:

"Sun Oil Company has violated the common law rights of Plaintiffs Wronski and Koziara by illegally, unlawfully and secretly draining valuable oil from beneath their properties."[6]

The nature of Sun Oil's violation, while not clearly stated by the trial court, was a claim for the conversion of oil.

" 'Conversion is any distinct act of dominion wrong-

---

[6] Trial court opinion at 14.

fully exerted over another's personal property in denial of or inconsistent with his rights therein.' " *Thoma v Tracy Motor Sales Inc,* 360 Mich 434, 438; 104 NW2d 360 (1960), quoting *Nelson & Witt v Texas Co,* 256 Mich 65, 70; 239 NW 289 (1931).

We only address the finding regarding conversion as it is dispositive of the questions in this appeal.

In Michigan we adhere to the ownership-in-place theory. *Attorney General v Pere Marquette R Co,* 263 Mich 431; 248 NW 860 (1933). Under this theory "the nature of the interest of the landowner in oil and gas contained in his land is the same as his interest in solid minerals". William and Meyers, Oil and Gas Law, § 203.3, p 44. Solid minerals are a part of the land in or beneath which they are located, *Mark v Bradford,* 315 Mich 50; 23 NW2d 201 (1946), and as a consequence the owner of land is also the owner of the oil and gas in or beneath it.

Oil and gas, unlike other minerals, do not remain constantly in place in the ground, but may migrate across property lines. Because of this migratory tendency the rule of capture evolved. This rule provides:

" 'The owner of a tract of land acquires title to the oil and gas which he produces from wells drilled thereon, though it may be proved that part of such oil or gas migrated from adjoining lands. Under this rule, *absent some state regulation of drilling practices,* a landowner * * * is not liable to adjacent landowners whose lands are drained as a result of such operations * * *. The remedy of the injured landowner under such circumstances has generally been said to be that of self-help— "go and do likewise".' " William and Meyers, *supra,* § 204.4, pp 55-57. (Emphasis supplied.)

This rule of capture was a harsh rule that could

work to deprive an owner of oil and gas underneath his land. To mitigate the harshness of this rule and to protect the landowner's property rights in the oil and gas beneath his land, the "fair share" principle emerged.

"As early as 1931, the Board of Directors of the American Petroleum Institute expressed this principle by declaring a policy:
"that it endorses, and believes the petroleum industry endorses the principle that each owner of the surface is entitled only to his equitable and ratable share of the recoverable oil and gas energy in the common pool in the proportion which the recoverable reserves underlying his land bears to the recoverable reserves in the pool." Graham, *Fair Share or Fair Game? Great Principle, Good Technology—But Pitfalls in Practice,* 8 Nat Res Law 61, 64-65 (1975).

The API clarified the principle in 1942 by saying:

"Within reasonable limits, each operator should have an opportunity equal to that afforded other operators to recover the equivalent of the amount of recoverable oil [and gas] underlying his property. The aim should be to prevent reasonably avoidable drainage of oil and gas across property lines that is not offset by counter drainage." *Id.* at 65.

This fair-share rule does not do away with the rule of capture, but rather acts to place limits on its proper application.

Texas has adopted both the ownership-in-place doctrine and the fair-share principle. Its courts have addressed the interrelationship between these two principles and the rule of capture.

"It must be conceded that under the law of capture there is no liability for reasonable and legitimate drainage from the common pool. The landowner is privileged

to sink as many wells as he desires upon his tract of land and extract therefrom and appropriate all the oil and gas that he may produce, *so long as he operates within the spirit and purpose of conservation statutes and orders of the Railroad Commission.* These laws and regulations are designed to afford each owner a reasonable opportunity to produce his proportionate part of the oil and gas from the entire pool and to prevent operating practices injurious to the common reservoir. In this manner, if all operators exercise the same degree of skill and diligence, each owner will recover in most instances his fair share of the oil and gas. *This reasonable opportunity to produce his fair share of the oil and gas is the landowner's common law right under our theory of absolute ownership of the minerals in place.* But from the very nature of this theory the right of each land holder is qualified, and is limited to legitimate operations." *Elliff v Texon Drilling Co,* 146 Tex 575, 582; 210 SW2d 558 (1948). (Emphasis supplied.)

The rule of capture is thus modified to exclude operations that are in violation of valid conservation orders.

Michigan recognizes the fair-share principle and its subsequent modifications of the rule of capture. When an adjacent landowner drilled an oil well too close to a property line the Supreme Court said that this:

"[D]eprived plaintiff of the opportunity of claiming and taking the oil that was rightfully hers; and defendants must respond in damages for such conversion." *Ross v Damm,* 278 Mich 388, 396; 270 NW 722 (1936).

The supervisor of wells act also incorporated the fair-share principle into § 13. This section concerns proration orders and states in part that:

"The rules, regulations, or orders of the supervisor shall, so far as it is practicable to do so, afford the owner of each property in a pool *the opportunity to*

*produce his just and equitable share of the oil and gas in the pool,* being an amount, so far as can be practicably determined and obtained without waste, and without reducing the bottom hole pressure materially below the average for the pool, substantially in the proportion that the quantity of the recoverable oil and gas under such property bears to the total recoverable oil and gas in the pool, and for this purpose to use his just and equitable share of the reservoir energy." MCL 319.13; MSA 13.139(13). (Emphasis supplied.)

This right to have a reasonable opportunity to produce one's just and equitable share of oil in a pool is the common-law right that the trial court found Sun Oil violated. Under the authority of *Ross v Damm, supra,* if it can be said that Sun Oil's overproduction deprived plaintiffs of the opportunity to claim and take the oil under their respective properties, then Sun Oil will be liable for a conversion.

Production in the Columbus 3 field was restricted to 75 barrels of oil per well per day. Compulsory pooling was also in effect, limiting the number of oil wells to one per 20 acres, and specifying their location. The purpose behind proration is that the order itself, if obeyed, will protect landowners from drainage and allow each to produce their fair share. A violation of the proration order, especially a secret violation, allows the violator to take more than his fair share and leaves the other landowners unable to protect their rights unless they also violate the proration order. We therefore hold that any violation of a proration order constitutes conversion of oil from the pool, and subjects the violator to liability to all the owners of interests in the pool[7] for conversion

---

[7] When there is conversion from a common pool all those having an interest therein are harmed. It would be advisable to join all such parties, but we do not require such joinder.

of the illegally-obtained oil.[8] See *Bolton v Coats,* 533 SW2d 914 (Tex, 1975), *Ortiz Oil Co v Geyer,* 138 Tex 373; 159 SW2d 494 (1942). The trial court found that Sun Oil produced 150,000 barrels of oil from the Columbus 3 pool in contravention of the order of the Supervisor of Wells, and that 50,000 barrels of this oil had been drained from the lands of plaintiffs, which the trial court identified as a violation of the plaintiffs' common-law rights. The finding that Sun Oil is liable to plaintiffs for the conversion of 50,000 barrels of oil is affirmed.

The rule as to the amount of damages for a conversion of oil was established in Michigan in *Robinson v Gordon Oil Co,* 266 Mich 65, 253 NW 218 (1934). The Court stated:

"The general rule in the United States in actions for the conversion of oil, as in the case of conversion of minerals and other natural products of the soil is that, although a wilful trespasser is liable for the enhanced *value of the oil at the time of conversion* without deduction for expenses or for improvements by labor, an innocent trespasser is liable only for the value of the oil undisturbed; that is, he is entitled to set off the reasonable cost of production." (Citations omitted.) *Robinson, supra,* at 69. (Emphasis supplied.)

This rule sets the liability of the convertor as the enhanced value of the oil at the time of conversion, but then subdivides this liability into two subrules depending upon the nature of the conversion. These two subrules are a "mild" rule which applies to innocent or nonwilful conversion and a "harsh" rule which applies to bad faith or wilful conversions.

Both the mild rule and the harsh rule are

[8] Illegal oil is any oil produced in violation of a rule or regulation of the supervisor. MCL 319.2(m); MSA 13.139(2)(m). It is subject to confiscation and sale by the supervisor. MCL 319.21; MSA 13.139(21):

discussed in Anno: *Right of trespasser to credit for expenditures in producing, as against his liability for value of, oil or minerals,* 21 ALR2d 380. It indicates that:

"The 'mild' rule is applied where the trespass is inadvertent or not wilful or not in bad faith, and fixes the damages as the value of the minerals in situ. Where such value can be ascertained, the question of allowance or disallowance of credit to the trespasser for his expenditures in producing the minerals is not reached. Where evidence of value in situ cannot be obtained, two methods are used to establish the equivalent of such value: (1) the royalty method, whereby the injured party is allowed the amount for which the privilege of mining and removing the minerals under the customary lease or conveyance of the mineral rights could be sold, and (2) the value of the minerals after extraction less the production costs." 21 ALR2d at 382.

Both methods of determining the value of the minerals in situ have been applied in Michigan, the royalty method in *Ross v Damm, supra,* and the value of minerals after extraction less production costs method in *Eagle Oil Corp v Cohassett Oil Corp,* 263 Mich 371; 248 NW 840 (1933). The annotation further indicates that:

"The 'harsh' rule is applied where trespass is wilful or in bad faith, and allows the injured party the enhanced value of the product when and where it is finally converted without any credit to the trespasser for his expenses in producing it or for any value he might have added to the minerals by his labor. The award of enhanced value as damages without any credit to the trespasser for his expenditures in production *is actually an award of compensatory damages plus punitive damages* because of the wilfulness or bad faith of the trespass." 21 ALR2d at 382. (Emphasis supplied.)

While there are no reported cases applying this harsh rule in Michigan, *Robinson v Gordon Oil Co, supra,* clearly indicates that it is the law within this state.

The trial court applied the "mild" rule with a royalty method of determining the value in situ and added exemplary damages. This method was improper since the court specifically found that Sun Oil was an intentional and wilful convertor and that the oil was produced in violation of the leases. The "harsh" rule should have been applied in this instance, and plaintiffs awarded the value of the oil at the time of conversion. The addition of exemplary damages was also improper.

In Michigan the categories of punitive and exemplary damages are often incorrectly interchanged. Punitive damages are damages awarded solely to punish. *Kewin v Massachusetts Mutual Life Ins Co,* 79 Mich App 639; 263 NW2d 258 (1977). Exemplary damages are compensatory in nature and not punitive, since they are properly an element of actual damages. *Ray v Detroit,* 67 Mich App 702; 242 NW2d 494 (1976). The trial court assessed what it called exemplary damages.

"The Court finds the primary purpose of exemplary damages in Michigan to be an assessment of damages against a defendant that will discourage the defendant from continuing with intentional, wilful and illegal acts and to encourage a defendant to adopt practices and procedures that will prevent damages and losses to plaintiffs as well as to parties similarly situated to plaintiffs."[9]

It is clear that the exemplary damages awarded were actually punitive damages. Application of the "harsh" rule of damages includes an amount for

---

[9] Trial court opinion at 17.

punitive damages and they may not be assessed twice.

As indicated in *Robinson v Gordon Oil Co, supra,* the measure of damages is the value of the oil at the time of the conversion. This is in keeping with the general rule in conversion actions that the measure of damages is the market value at the time of the conversion plus interest. *Baxter v Woodward,* 191 Mich 379; 158 NW 137 (1916), *Bowen v Detroit United R Co,* 212 Mich 432; 180 NW 495 (1920), *Ross v Damm, supra, Embrey v Weissman,* 74 Mich App 138; 253 NW2d 687 (1977). The evidence at trial indicated that the selling price for oil from the Columbus 3 field during the period of conversion was from $3.17 to $5.02 per barrel, with a weighted average price of $3.65 per barrel. The price fluctuated from $13.35 to $5.15 per barrel, with a weighted average of $10.34 per barrel, in the period after the conversion ended and up to the time of trial. The trial court utilized $12.50 per barrel as an average price upon which to calculate damages. This figure was clearly erroneous because it does not reflect the value of the converted property at the time of conversion. There is a doctrine that the measure of damages for conversion of goods that fluctuate in value is the highest value between conversion and judgment, but this has never been applied in Michigan. See Anno: *Allowance as damages for conversion of commodities or chattels of fluctuating value, of increase in market value after the time of conversion,* 40 ALR 1282; 87 ALR 817. We do not choose to apply this doctrine in this instance.

Sun Oil's conversionary actions occurred from February 1970 through June 1974. When a conversion occurs over such an extended period of time it

is difficult to fix a market price. A weighted average might effectively compensate the plaintiffs, or it might understate the total damages. Since it is impossible to accurately determine the proper price, the highest price during the period, $5.02 per barrel, should be utilized. This will insure that the innocent party will receive adequate compensation for the injury suffered.

Plaintiffs requested that the leases with Sun Oil be rescinded *ab initio,* but this remedy was refused by the trial court. The grant or denial of rescission is not a matter of right, but rather lies within the discretion of the trial court. *Bechard v Bolton,* 316 Mich 1; 24 NW2d 422 (1946). Plaintiffs have been adequately compensated by the damage award. We agree with the trial court that rescission would not be appropriate in this instance.

Affirmed in part. Reversed in part. Remanded for entry of a judgment not inconsistent with this opinion.[10] No costs, neither party having prevailed in full.

[10] The total damages awardable in this case is $251,000 based upon the conversion of 50,000 barrels of oil valued at $5.02 per barrel. Plaintiffs Koziara are entitled to $187,815.85 due to their ownership of 72.835% of the converted oil. Plaintiffs Wronski are entitled to $68,189.15 due to their ownership of 27.165% of the converted oil.