*Decision will be entered for the respondent.*

EUGENE H. KOZIARA AND LAURA A. KOZIARA, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

ANIELA KOZIARA, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 10828-80, 11321-80.  Filed May 21, 1986.

*Robert M. Justin,* for the petitioners.
*Clyde W. Mauldin,* for the respondent.

## OPINION

SWIFT, *Judge:* This matter is before the Court on cross motions for summary judgment, filed October 19, 1984.

These cases have been consolidated for purposes of trial, briefing, and opinion. The pertinent facts have been fully stipulated and are set forth below.

In separate statutory notices of deficiency dated April 7, 1980, respondent determined deficiencies in petitioners' Federal income tax liabilities and additions to tax as follows:

### PETITIONERS EUGENE H. KOZIARA AND LAURA A. KOZIARA

#### DOCKET NO. 10828-80

| Year | Deficiencies | Additions to tax sec. 4973[1] |
|---|---|---|
| 1975 | $244.29 | $73.38 |
| 1976 | 7,144.93 | 73.38 |
| 1977 | 38,113.56 | 73.38 |

### PETITIONER ANIELA KOZIARA

#### DOCKET NO. 11321-80

| Year | Deficiencies |
|---|---|
| 1975 | $1,623.16 |
| 1976 | 9,414.35 |
| 1977 | 43,319.93 |

Following concessions, the issue remaining for decision is whether royalty payments received by petitioners in 1975, 1976, and 1977 from Sun Oil Co. with respect to their interests in certain oil and gas deposits constitute ordinary income, or whether the royalty payments constitute capital gain income because they allegedly arose out of a condemnation or involuntary conversion of petitioners' rights to a portion of the oil and gas deposits.

Petitioners Eugene H. and Laura A. Koziara are husband and wife and were residents of Sterling Heights, Michigan, at the time their petition was filed herein. Laura A. Koziara is a petitioner herein solely because she joined with her husband Eugene H. Koziara in filing joint Federal income tax returns. Petitioner Aniela Koziara is the mother of

[1] All section references are to the Internal Revenue Code of 1954 as in effect during the years in issue.

Eugene H. Koziara and was a resident of Smiths Creek, Michigan, at the time her petition was filed.

In 1975, 1976, and 1977, petitioners Eugene H. and Aniela Koziara were the owners in joint tenancy of certain land in St. Clair County, Michigan. Under petitioners' land were located oil and gas deposits. The deposits were part of a larger reservoir of oil and gas deposits known as the Columbus Section 3 Saline-Niagaran Formation Pool (herein-after sometimes referred to as the Columbus 3 Pool). Petitioners' land consisted of a total of 80 acres, including two 20-acre parcels referred to as tracts one and two, and a 40-acre parcel referred to as tract six. During 1975, 1976, and 1977, one well was located on tract two, and two wells were located on tract six. No wells were located on tract one.

Prior to September 14, 1963, the land was owned by petitioner Aniela Koziara and her husband, Frank, as tenants by the entirety. They entered into a lease agree-ment on March 16, 1961, with Joseph Adair (Adair) under which Adair acquired the right to explore and drill for oil and gas on tracts one, two, and six, and under which Aniela and Frank Koziara reserved a royalty interest of one-eighth of the proceeds received from the oil and gas extracted. The land owned by Aniela and Frank Koziara was converted to a joint tenancy on September 14, 1963, and an interest therein was transferred by deed to Eugene H. Koziara.

Frank Koziara died in 1974. Thereafter, tracts one, two, and six have been owned by Eugene H. Koziara and Aniela Koziara. By 1975, the lease with Adair apparently had expired and Adolph Rovsek had become the lessee of the working interest in tract two. The Koziaras owned 100 percent of the royalty rights with respect to tract one and a royalty interest of 20.83 percent in tract two.

With respect to tract six, on May 21, 1968, Sun Oil Co. acquired from Adair the rights Adair had under the March 16, 1961, lease to explore and drill for oil and gas on that tract. On November 4, 1971, the three Koziaras and Sun Oil Co. amended the lease with respect to tract six, pursuant to which the royalty interest of the Koziaras was increased from one-eighth to seven thirty-seconds. In November of 1971, the Koziaras conveyed to a third party not specified

in the record herein, an undivided one thirty-seconds royalty interest in oil and gas extracted from tract six, leaving the Koziaras a royalty interest therein of six thirty-seconds.In 1969 and 1970, the three parcels of oil-producing land owned by petitioners were the subject of an order issued by the Supervisor of Wells of the Michigan Department of Natural Resources. In 1969, the Michigan Supervisor of Wells, pursuant to the authority granted to him by Mich. Stat. Ann. sec. 13.139(1) through sec. 13.139(24) (Callaghan 1981), issued an order establishing 20-acre drilling units for all land that overlaid the Columbus 3 Pool and providing a uniform well-spacing pattern on that land. The purpose of that order was to provide for the orderly and efficient development of the reservoir of oil and gas in the Columbus 3 Pool. Another order, referred to as a "proration order," was issued by the Michigan Supervisor of Wells effective February 1, 1970. The proration order limited extraction of oil from the Columbus 3 Pool to a maximum of 75 barrels per well per day.

On March 20, 1973, Sun Oil Co., as lessee of the working interest in tract six, requested the Michigan Supervisor of Wells to unitize all oil and gas deposits in the Columbus 3 Pool in order to improve the secondary recovery of oil and gas deposits in the reservoir. Unitization is a procedure authorized under Michigan law (see Mich. Stat. Ann. sec. 13.139(101) through sec. 13.139(144) (Callaghan 1981)), under which an owner of a working interest in a portion of a particular reservoir of oil and gas may be designated to be the sole person or entity with the right to extract oil and gas from the reservoir. The various land owners and owners of working interests in an oil and gas deposit affected by a unitization order are assigned percentage royalty interests in the oil and gas that is extracted from the reservoir by the individual or entity who is authorized to proceed therewith.

On June 20, 1973, the Michigan Supervisor of Wells issued a provisional order granting the request of Sun Oil Co. for unitization of the Columbus 3 Pool. A permanent unitization order was issued on June 25, 1974, after Sun Oil Co. had obtained written approval of the unitization plan from those who owned approximately 75 percent of the

royalty rights to the oil and gas deposits in the Columbus 3 Pool.

Under the agreement entered into with respect to unitization of the oil and gas deposits in the Columbus 3 Pool, participants in the agreement were to receive payments of royalties according to a formula which reflected the size of the land parcel they owned over the Columbus 3 Pool (or the extent of their working interest therein) and the extent to which oil and gas was extracted from their parcel during the fourth quarter of 1971.

On June 29, 1974, petitioners Eugene H. and Aniela Koziara, and on July 5, 1974, Walter and Eleanor Wronski (who also owned land over the Columbus 3 Pool) appealed the unitization order to the Michigan Supervisor of Wells. They alleged that the royalty participation percentages provided in the unitization order were arbitrary and unreasonable, that the unitization order violated State and Federal statutes which prohibited monopolies and restraints of trade, and that the unitization order was unconstitutional. In subsequent documents filed with the Michigan Supervisor of Wells, they also alleged that Sun Oil Co. extracted excess oil and gas from the Columbus 3 Pool during the years 1971 through 1974, that Sun Oil Co. never had obtained the requisite 75-percent approval of the owners of the Columbus 3 Pool which was required prior to issuance of a unitization order, and that Sun Oil Co. was not the proper party to request unitization of the Columbus 3 Pool. The Michigan Supervisor of Wells ruled against the appeal filed by the Koziaras and the Wronskis on the merits and on the ground that some of the allegations were untimely raised.

In April of 1975, the Koziaras and the Wronskis filed a lawsuit against Sun Oil Co. in the Circuit Court for the County of St. Clair, Michigan, wherein they alleged that Sun Oil Co. had extracted oil and gas from the Columbus 3 Pool in excess of that to which it was entitled under the unitization and proration orders. In that lawsuit, the Circuit Court found that Sun Oil Co. had illegally extracted 150,000 barrels of oil from the Columbus 3 Pool, of which one-third or 50,000 barrels were attributable to the interests of the Koziaras and the Wronskis, and damages were imposed

against Sun Oil Co. based on a value for the excess oil extracted of $12.50 per barrel. On appeal, the Michigan Court of Appeals reversed the decision of the Circuit Court with respect to the amount of damages, holding that $5.02 per barrel was the proper measure of the excess oil extracted. Also, the Court of Appeals reversed the Circuit Court's award of punitive damages against Sun Oil Co. The appellate opinion is set forth at *Wronski v. Sun Oil Co.*, 89 Mich. App. 11, 279 N.W.2d 564 (1979).

On February 28, 1979, the Koziaras and the Wronskis filed another action against Sun Oil Co.—this time in the Circuit Court for the County of Ingham, Michigan. This action was based upon their allegation that the unitization order was obtained by Sun Oil Co. without first obtaining the consents thereto of 75 percent of the owners of the affected land or of the holders of the working interests in the Columbus 3 Pool, and also on their allegation that their royalty participation percentages under the unitization order should have been higher. The Circuit Court dismissed the action without issuing a written opinion. The Koziaras and the Wronskis appealed that dismissal, and the Michigan Court of Appeals remanded the action to the Circuit Court for further hearings with respect to the effect on the computation of the royalty participation percentages of the extraction by Sun Oil Co. of excess oil and gas from the reservoir during the fourth quarter of 1971.

In 1975, 1976, and 1977, Sun Oil Co. made payments under the unitization order to petitioners with respect to oil extracted from tracts two and six, as follows:

| Year | Payments |
|------|----------|
| 1975 | $212,764.14 |
| 1976 | 275,735.60 |
| 1977 | 213,347.80 |

For each of the above years, Sun Oil Co. provided petitioners Forms 1099-MISC, reflecting the above amounts as royalty income.

On their 1975 and 1976 Federal income tax returns, both Eugene H. Koziara and Aniela Koziara reported the royalty payments received from Sun Oil Co. as ordinary income. On their 1977 Federal income tax returns, petitioners reported the royalty payments as capital gain income because an

involuntary conversion allegedly had occurred with respect to their interests in the Columbus 3 Pool by virtue of the unitization order. Petitioners subsequently filed amended 1975 and 1976 Federal income tax returns, claiming capital gain treatment with respect to the royalty payments they had received in those years.

The issue for decision is whether the unitization of petitioners' interests in the oil and gas deposits located in the Columbus 3 Pool constituted an involuntary conversion under section 1231, as petitioners contend, entitling them to treat the royalty payments received with respect thereto as capital gain income. Respondent's position is that no involuntary conversion within the meaning of section 1231 occurred and that royalty payments petitioners received from Sun Oil Co. are to be treated as ordinary income. For the following reasons, we agree with respondent.

Royalty payments received with respect to the extraction of oil and gas or other minerals generally are taxable as ordinary income. *Burnet v. Harmel*, 287 U.S. 103 (1932); *Kittle v. Commissioner*, 21 T.C. 79 (1953), affd. 229 F.2d 313 (9th Cir. 1956). Section 1231(a)[2] provides however, among other things, that recognized gains from the compulsory or involuntary conversion of property used in a trade or business and capital assets held for more than 6 months (9 months in 1977) shall be treated as capital gain income. Section 1.1231-1(e), Income Tax Regs., defines involuntary conversion of property as follows:

(e) *Involuntary conversion*—(l) *General rule.* For purposes of section 1231, the terms "compulsory or involuntary conversion" and "involuntary conversion" of property mean the conversion of property into money or other property as a result of complete or partial destruction, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof. * * *

---

[2]Sec. 1231(a), as applicable to the years in question, provides in part:

SEC. 1231(a). GENERAL RULE.—If, during the taxable year, the recognized gains on sales or exchanges of property used in the trade or business, plus the recognized gains from the compulsory or involuntary conversion (as a result of destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation or the threat or imminence thereof) of property used in the trade or business and capital assets held for more than 6 months [9 months in 1977] into other property or money, exceed the recognized losses from such sales, exchanges, and conversions, such gains and losses shall be considered as gains and losses from sales or exchanges of capital assets held for more than 6 months [9 months in 1977]. If such gains do not exceed such losses, such gains and losses shall not be considered as gains and losses from sales or exchanges of capital assets. * * *

Petitioners refer to the broad powers given to the Michigan Supervisor of Wells under the Michigan unitization statute (which powers include the right to modify or terminate all leases, contracts, and property rights of an owner)[3] in support of their contention that the unitization of their interests in the Columbus 3 Pool constituted an involuntary conversion, particularly in light of the fact that petitioners voted against unitization. Respondent argues that there has been no taking of petitioners' property sufficient to constitute an involuntary conversion, and that the unitization of petitioners' interests represented a regulation of the oil and gas deposits, not a condemnation or involuntary conversion thereof.

In *American National Gas Co. v. United States*, 150 Ct. Cl. 572, 279 F.2d 220 (1960), cert. denied 364 U.S. 900 (1960), the terms "requisition or condemnation" were construed as they appeared in section 117 of the Internal Revenue Code of 1939, which is the predecessor statute to section 1231. In that case, the taxpayer contended that an involuntary conversion had occurred when it sold its stock in the Detroit Edison Co. pursuant to an order issued to it by the Securities and Exchange Commission (SEC). The court emphasized that the purpose of the Public Utility Holding Act of 1935, 49 Stat. 803, 15 U.S.C. sec. 79(a) et seq. (1982), pursuant to which the SEC had issued its order, was to protect the public welfare from perceived abuses in the operation of public utility holding companies, not to requisition or to condemn the taxpayer's property. The court explained the limitations of the terms "requisition or condemnation" as follows:

Plaintiffs say that the term "requisition or condemnation" as used in the Act means something more than the exercise of the power of eminent domain. We do not think it does. It seems clear to us that the words mean the taking or the threat of taking property by some public or quasi-public corporation—by some instrumentality that has the power to do so against the will of the owner, and for the use of the taker. That is the common, well-recognized meaning of those words and there is nothing

---

[3]Mich. Stat. Ann. sec. 13.139(l18) (Callaghan 1981), provides:

"Amendment of instruments to conform to act. Sec. 18. Property rights, leases, contracts and all other rights and obligations shall be regarded as amended and modified to the extent necessary to conform to the provisions and requirements of the act and to any valid and applicable plan of unitization or order of the supervisor made pursuant to this act."

to indicate that Congress used them in any other sense. Plaintiffs were required to dispose of their property, but the United States did not take it, nor did it prevent plaintiffs from getting for it its full market value at the time of the taking. [*American Natural Gas Co. v. United States*, 279 F.2d at 225.]

The foregoing interpretation of the meaning of the terms "requisition or condemnation" was expressly approved by this Court in *Dorothy C. Thorpe Glass Mfg. Corp. v. Commissioner*, 51 T.C. 300, 305 (1968). In that case, an affiliated corporation leased from an unrelated third party a building that was adjacent to petitioner's building. The affiliated corporation was threatened with legal action by a city attorney for violating a municipal ordinance with respect to the use of the leased building. It was determined for business reasons that petitioner and the affiliated corporation both would relocate their offices into a new building. Petitioner was denied nonrecognition treatment under section 1033 on the gain from the sale of its building on two grounds: (1) Petitioner had no legal interest in the adjacent real estate threatened by legal action, and (2) the threat of legal action did not constitute an involuntary conversion by "requisition or condemnation."

Michigan law expressly provides that the ownership of land and the interests affected by unitization remain unchanged. The relevant statute provides as follows:

Title to oil and gas rights in tracts in unit area. Sec. 15. Except to the extent that the parties specifically so agree, no order for unit operations shall be construed to result in a transfer of all or any part of the title of any person to the oil and gas rights in any tract in the unit area. * * * [Mich. Stat. Ann. sec. 13.139(115) (Callaghan 1981).]

The purpose of Michigan's unitization law is to regulate the extraction of oil and gas so that the interests of various affected parties will be protected—not taken away. In the absence of such a regulatory scheme, a single land owner might be able to extract all oil and gas in a reservoir to the detriment of adjacent landowners. The Michigan unitization procedure represents a regulation of the extraction process in order to avoid such a result, not the exercise of the power of eminent domain, nor does it constitute an involuntary conversion of property interests of the affected parties.

We note the similarities between this case and *Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130 (1960). Therein, the U.S. Government took over the operation of a common carrier during World War II, although ownership of the carrier was retained by the taxpayer who resumed operation of the business at the end of the war. A governmental claims commission awarded the taxpayer $122,926.21, representing the fair rental value of the business during the period the government operated it. The taxpayer contended that the $122,926.21 was received as the result of an involuntary conversion pursuant to section 117 (the predecessor statute to section 1231). The Supreme Court held, however, that the $122,926.21 was taxable as ordinary income because the Government had not taken over ownership of the business, but only "the right to determine the use to which the [business] would be put." The Supreme Court also noted—

The words "seizure" and "requisition" are not thereby deprived of effect, since they equally cover instances in which the Government takes a fee or damages or otherwise impairs the value of physical property. [364 U.S. at 136.]

In summary, we conclude that neither petitioners' land nor petitioners' rights to and interests in the oil and gas deposits under their land were the subject of an involuntary conversion, requisition, or condemnation or the threat thereof. The unitization order issued herein under Michigan law did not constitute the exercise of the State's power of eminent domain. The royalty payments petitioners received from Sun Oil Co. during the years in issue are properly taxable to them as ordinary income. Respondent's motion for summary judgment will be granted, and petitioners' motion for summary judgment will be denied.

Accordingly,

*Appropriate orders and decisions will be entered under Rule 155.*